NO. 07-03-0323-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL E

FEBRUARY 18, 2005

_____


BERNARDO LICON JR., APPELLANT

v.

THE STATE OF TEXAS, APPELLEE


_____

FROM THE 137TH DISTRICT COURT OF LUBBOCK COUNTY;

NO. 2002-400918; HON. CECIL G. PURYEAR, PRESIDING

_____

Before QUINN and REAVIS, JJ., and BOYD, S.J.[1]


In this appeal, appellant Bernardo Licon, Jr. presents one issue, contending the trial court reversibly erred in excluding the testimony of Daphnie Craft and that his conviction of aggravated assault with a deadly weapon and the resulting jury-assessed punishment, enhanced by a prior conviction, of 30 years confinement in the Institutional Division of the

_____

[1]John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. Tex. Gov't Code Ann. §75.002(a)(1) (Vernon Supp. 2004).

Department of Criminal Justice must be set aside. Disagreeing that reversible error is shown, we affirm the judgment of the trial court.

The State's evidence showed that on September 5, 2002, Amor Wharton was at her home in Lubbock when appellant, who was her ex-husband, entered her home. Once inside, she averred, appellant started "screaming and hollering" and hitting her, and she headed to the telephone. As she did so, appellant grabbed the telephone and, using the "curly part" of the line, started choking her. As he did so, he told her that if she was going to call anyone, she "better call and tell them [she] was fixing to die." As the assault progressed, she said, appellant "started wrapping it, so I just let go of the receiver and I just tried to grab the cord off my neck, and then he grabbed the receiver and just started hitting me over the head with it." Then, she said, she let go of the cord and was able to retrieve some coasters off a table, hit appellant on the head with them, which partially stunned him and allowed her to free herself. She also pretended to be talking on the phone, and appellant fled the scene. Shortly after the incident, appellant's boyfriend returned home. Finding Amor in hysterics and appearing to have been assaulted, he took Amor to the sheriff's office to report the matter. As a result of the accident, Amor suffered a black eye, bumps on her head, some cuts, and some marks on her neck.

In the matter giving rise to appellant's issue, he called Daphnie Craft, Amor's daughter, to testify about Amor's "tendency to exaggerate what's actually happened" and her not being truthful when it involved appellant. The trial court conducted a *voir dire* examination of the tendered witness. Because of that *voir dire* examination and the ensuing

2

exclusion of the witness' testimony, we set out in full the pertinent parts of that examination. The record shows the following:

Q: [By appellant's trial counsel] Daphnie, how old are you?

A: Sixteen.

Q: Okay. And is Amor Wharton--is she your mother?

A: Yes.

THE COURT: Ma'am, pull that microphone towards you and keep your voice up. I'm having trouble hearing you and I know the Court Reporter probably is, too.

Ms. Craft: Okay.

Q: . . . In September of 2002, were you living in her home, or in your mother's home, with John?

A: No, I was staying with my dad.

Q: Okay. I have talked with you about the possibility of your testifying in this case.

You understand you're not going to be asked about any kind of specific events of anything that your parents have done to each other?

A: Yes, sir.

Q: I was intending to call you as a reputation-type witness.

Do you understand what that means?

A: Yeah.

Q: Okay. You've known your mother, I guess, for 16 years?

A: Yes, sir.

Q: Okay. And you've known your father also for the same period of time?

A: Yes, sir.

3

Q:  And during that period of time you've developed an opinion about--in the case of your mother, her propensity towards, I guess, being aggressive or violent in a situation where, well, the general population is involved?

A: Yes.

Q: Is she violent towards other people in general?

A: No, she is not violent towards people in general.  She is just violent towards my dad.

Q: Okay.  My next question was going to be if your opinion about her propensity towards being aggressive or being violent where your father is concerned is different from the general population.

The next question I have is about your mother's--your opinion as to your mother's truthfulness in testifying or stating things as being fact.

Do you have one opinion for your mother's truthfulness generally as to all persons?

A:  Well, my mom, she is not really a violent person.  It's just that sometimes she gets real mad at my dad and, I don't know, she gets kind of crazy.

Q: That's probably more detail than what the other questions were asking for.

A:  Well,--

Q:  I was asking about her truthfulness.

Does she--do you have an opinion about her reputation for being truthful, as to just generally?

A: Yes.  She can be truthful.  But sometimes she can be a bit--she'll exaggerate more than what he really is.

Q:  You said "he really is," are you referring to she is not always as truthful when it involves your father?

A:  Yeah. Yeah.

The witness was passed to the State, who questioned her as follows:

4

Q:  Ma'am, I guess really the question is, do you have an opinion in the form of --either your opinion or your mom's reputation in the community in which she resides as to her truthfulness or untruthfulness?

That's what I need to know from you.

Do you have an opinion yourself or are you familiar with her reputation in the community where she lives, as to where she lives, as to her truthfulness or untruthfulness?

A:  Like around her work or around her neighborhood?

Q:  Yeah, around the community.

A:  Yeah, she is usually truthful to people.

Q:  Okay. So her reputation is that she is truthful?

A:  Uh-huh.

Q:  And you've got to answer "Yes" or "No."

A:  Yes.

Q:  Okay.  So that's what--so, her reputation is that she is truthful?

A:  Yes.

Q:  Okay.  And she doesn't have a reputation for being untruthful?

A:  Unless, like, it's to us or, you know,--

Q:  She's got a reputation of being untruthful to you?

A:  Well, yeah, but not to where it's real bad, It's just like, "Are you going to come pick me up," and she'll say, "Yeah," and then sometimes she won't come.

Q:  Okay.  But I mean--

A:  It's just--it's not to people out in the community, like, people she sees.  Like for once, it's just to, like, people she's known for a while, she sometimes lies to.

Q:  So, is your opinion then that she is truthful?

5

A: Yes, to people she's met barely.

Q: Okay. To people that she's barely met?

A: Yes.

Q: Okay. So, she is not going to exaggerate to people she's barely met?

A: Well, if we're like under the--like, right now, if we're in court, yeah, she exaggerates a lot. Or, like, when we're in front of our family and she'll start telling a story, she'll get a little bit too--she'll say more of the story than what it really is.

Q: Okay. Well, here it is, Daphnie, because you're telling us two different things. Okay? You're saying she is truthful and then you're saying she is truthful to people that she meets. And now, all of a sudden, you're coming back and saying she is untruthful.

So, either she is truthful or she is not truthful, and I need to know which one it is.

A: She is truthful only to people that she's barely met. But like, if she is under a state of law or if she's in front of her family or people she's known for years, she tends to lie sometimes.

Q: Okay. So your opinion is that she is truthful?

A: Uh-huh.

Q: And you've got to answer "Yes" or "No."

A: Yes.

Q: And you said that she is violent towards your dad?

A: I mean, since we've grown up, yeah.

Q: How has she been violent towards your dad?

A: Arguing. The last time that they got into a fight, or an argument, actually, she hit him on the head with a coffee mug and hit him on the head with a phone, and she got arrested. And my little brother was sitting in his lap whenever it happened. And--

6

Q: She got arrested here in town?

A: Yes.

Q: Here in Lubbock?

A: Yes, sir.

Q: Okay. And I guess your dad pressed charges on her?

A: No, sir.

Q: He didn't press charges on her?

A: No, sir.

Q: Have you ever seen your dad be violent towards her?

A: Yes, I have seen--I have seen both of them.

Q: Okay. Did--have you talked with your dad about what happened on September 5th, 2002?

A: A little bit. He really hasn't told me that--well, he told me--my mom told me that she just--

Q: Okay. I don't want to know what your mom told you yet. I want to know what your dad told you.

A: Yeah, he told me about it.

Q: And what did he tell you?

A: That he had went over there to get my little brother's Social Security card and she didn't want to give it to him and that she tried to hit him with the phone.

Q: So, he went over there to get in the house to get your little brother's Social Security card?

A: Uh-huh.

Q: You've got to answer "Yes" or "No" because she is taking down what you say.

A: Yes.

Q: Okay. Did he say that he was invited over there?

A: Yeah, he had called before he went over there.

Q: And she invited him over there?

A: Yes, sir.

Q: Okay. That's what he says?

A: Uh-huh.

Q: You've got to answer "Yes" or "No" because she is taking down what you say.

A: Yes, sir.

Q: Okay. And what else did he tell you?

A. That she didn't want to give it to him. That's it.

Q. Okay. And so, what did he do because she didn't want to give it to him?

A: I don't know. He didn't tell me the rest of the story because I was leaving with my boyfriend --well, my husband, and then, I--my--I see my mom the next day and she told me that he had hit her with the phone, or something.

Q: Okay. And who told you that? I'm sorry. That he had--

A: My mom told me.

Q: Okay. And what happened then?

Did she have bruises on her?

A: No.

Q: She didn't have any bruises on her?

A: Well, I don't know because I was talking on the phone to her because she was with John at his house and I was at my boyfriend's mom's.

Q: Okay. How old is your boyfriend?

8

A: He is 19.

Q: Okay. And so, what happened then?

Did you see her later on that day, a couple of days later?

A: No, I didn't see her for, like, maybe two months.

Q: Okay. So you don't know if she had bruises on her or not?

A: No, sir.

Q: Okay. And you don't know what happened that day; right?

A: Huh-uh.

Q: You've got to answer "Yes" or "No" because she is taking down what you say.

A: No, sir.

Q: And have you talked with your dad about anything else that's happened in relationship to that day?

A: No, sir.

Q: Have you talked to him about coming to court to testify?

A: No, sir.

Appellant tendered Daphnie's testimony for the expressed purpose of showing the State's witness Amor Wharton's "tendency to exaggerate what's actually happened" and her not being truthful. The court commented: "The test for truthfulness is whether she has a reputation of being truthful in the community in which she lives. And her answer to that question was 'Yes.' I don't think she can qualify it, Counsel." The trial court then sustained the State's objection to Daphnie's testimony.

9

The admissibility of evidence generally and the qualifications of a witness to testify is within the discretion of the trial court and its decision to permit or not to permit the testimony will not be disturbed absent a showing of an abuse of discretion. *Burden v. State,* 55 S.W.3d 608, 615 (Tex. Crim. App. 2001); *Harnett v. State*, 38 S.W.3d 650, 657 (Tex. App.--Austin 2000, pet. ref'd). An appellate court will not reverse a trial court's ruling unless that decision falls outside the zone of reasonable disagreement. *Burden v. State*, 55 S.W.3d at 615.

Under the Rules of Evidence, a party may attack a witness' or other declarant's *general* capacity or disposition to tell the truth. *Schutz v. State*, 957 S.W.2d 52, 69 (Tex. Crim. App. 1997); Tex. R. Evid. 608(a). Specifically, that general lack of credibility may be shown by demonstrating the witness has a poor reputation in the community for truth or if a specific character witness testifies that, in his opinion, the fact witness is not a truthteller, and, in the witness' opinion, is not worthy of belief. *Dixon v. State*, 2 S.W.2d 263, 272 (Tex. Crim. App. 1999).

We have set out Daphnie's *voir dire* examination in detail above. We cannot say the trial judge abused his discretion in concluding that it was not sufficient to meet the requirement that the witness aver that Amor's general reputation for truthfulness was bad. Accordingly, appellant's sole issue is overruled and the judgment of the trial court is affirmed.

John T. Boyd
Senior Justice

Do not publish.